**STATE of Missouri, Respondent,**

v.

**Kenneth Earl JACKSON, Appellant.**

**Kenneth Earl JACKSON, Movant–Appellant,**

v.

**STATE of Missouri, Respondent.**

**Nos. 16899, 17240.**

Missouri Court of Appeals, Southern District, Division Two.

Jan. 27, 1992.

Brad B. Baker, Columbia, for appellant.

William L. Webster, Atty. Gen., Joseph P. Murray, Asst. Atty. Gen., Jefferson City, for respondent.

FLANIGAN, Chief Judge.

A jury found defendant Kenneth Jackson guilty of stealing, § 570.030,[1] and he was sentenced, as a prior and persistent offender, to 10 years' imprisonment. Defendant appeals, and that appeal is Case No. 16899. After the jury trial, defendant filed a motion under Rule 29.15 seeking post-conviction relief. The motion was denied after evidentiary hearing. Defendant's appeal from that denial is Case No. 17240. The appeals have been consolidated and will be dealt with separately in this opinion.

### Case No. 16899

The information, in addition to its formal portions, charged that defendant, on or about June 13, 1989, in Jasper County "appropriated cash, of a value of at least $150, which said property was in the possession of Ralph M. Green, and defendant appropriated such property without the consent of Ralph M. Green and with the purpose to deprive him thereof."

Defendant's sole point is that the trial court erred in giving Instruction 5, the state's verdict-directing instruction on stealing, "because the instruction hypothesized that either defendant or another man took cash in the possession of Ralph Green without his consent, for the purpose of withholding it from Ralph Green permanently, so that the jury was allowed to speculate as to things which defendant might have done which were not supported by evidence, thereby prejudicing defendant, as there was no direct evidence that defendant appropriated cash from Ralph Green, and defendant's liability was based solely on aiding the other man."

Defendant does not challenge the sufficiency of the evidence to support the verdict. He challenges the correctness of Instruction 5 and requests reversal and remand.

---

1. All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

The state's principal witness was Ralph Green, whose dealings with defendant and another man, referred to in the record as "the African," resulted in Green's losing $2,500.

Green, a 57-year-old college graduate, testified that on June 13, 1989, about 11:50 a.m., he went to Walmart in Joplin to buy some shotgun shells. The African accosted Green in the parking lot and asked for help. The African, a black man, told Green that he was from Africa, that he could not read "too good," and that he wanted to go to the Holiday Inn. Green said he would take him there. The African showed Green some money. "It looked like a large bill. It had a one and several zeros on it." The African said he was going to give Green money for taking him, but Green said, "No, I'll just take you there."

The African told Green that his brother had died in Springfield and that the African "came here and received a lot of money." He said that he was a third-class person in Africa and that he could not take the money home because they were not allowed to have money of their own so he had to give it away to some charitable organization. He said he needed "at least a couple of people to give it to so they can give it away to somebody that is a responsible person." Green told the African that they could probably find somebody at the Holiday Inn.

En route to the Holiday Inn, the African asked Green to pull in at McDonald's so the African could go to the restroom. At McDonald's, Green and the African got out of Green's truck. Green said "defendant appeared." Defendant is also black. "We called him over and told him our problem." Defendant said he "could help out a little bit." Defendant said he was going to go to work at McDonald's but "he had a little time" before he had to go to work.

At defendant's suggestion, the three men got into Green's truck to talk. Defendant sat in the middle. The African showed the money to defendant, who told the African he ought to put it up or somebody might steal it from him. The African said he wanted to give all of the money to a couple of responsible people. According to Green,

the African asked "both of us if we were responsible and we said 'Yes.'"

The African asked defendant if he could show he was responsible and defendant said, "Yes." The African said, "Could you show me lots of money, like $2,000?" Defendant said, "Yes, I could show you. I've got it here in McDonald's vault." The African said, "Show it to me and I will give you this big amount of money and you can give it to a charitable organization." Defendant said, "Okay, yeah. I can do that." Defendant went into McDonald's and came out a little bit later and showed the African the money defendant had, which was $2,000.

The African said to defendant, "You are a responsible person. I'll give you this money. You take it in and count it and come back and tell me if it's all there." The African said a prayer over the money, and defendant took it into McDonald's.

Before defendant returned, the African told Green, "I'm testing this man to see if he is honest so I gave him more money than I said. If he comes back and tells me only $25,000 I'll know he is not honest." Defendant returned from McDonald's and told the African, "I counted it and you gave me $27,000. It was supposed to be $25,000." The African told defendant, "Okay, you give that away." The African gave defendant the $27,000, if that is what it was.

Then the African told Green, "I have another $25,000 for you to give away." The African asked Green if he was a responsible person and religious. Green told the African that he was and showed him a card showing the church to which Green belonged. Defendant showed the African a card showing a church to which he belonged.

Green further testified: " 'They' asked me if I had any money and I said 'Yes.' I showed them my check book and 'they' said, 'No, that's paper money, that's no good. We've got to know that you can go in and get money on your own.' I told them that my money was in the bank and 'he' said, 'Let's go see.' Defendant said, 'Boy, we could give this away to a lot of organizations.' The African said, 'What

organization would you give it to' and I told him I would give it to the Boy Scout organization. There was discussion that I might be able to keep part of this money for myself. The African said, 'If you want, you can keep $5,000 of this on your own and give away $20,000.' I said it would be nice."

The three men drove to a bank at 7th and Main in Green's truck. Green was the driver. Defendant and the African both stayed in the truck and "they" insisted on Green not parking on the parking lot. "They" said to Green, "You go down and show me you can withdraw some money out of the bank."

Green went to the bank and withdrew $1,500 from his checking account which, prior to the withdrawal, had a balance of $1,596.60. He took the money to the truck and showed it to defendant and the African. The African said, "That's not enough. Are you sure you can't get some more?" Green replied that he had a savings account but he would have to go home and get the passbook.

The trio then went to Green's home where Green obtained the passbook. They returned to the bank where Green withdrew $1,000 from his savings account. Green said, "At that time the other money was sitting right there on the dash of the truck so when I got in the truck I handed all the money to the defendant, and defendant said, 'Hey, I'll count it for you.'" Defendant then counted the $2,500 which Green had obtained.

The African then showed Green "this roll of money" that the African had, and the African suggested that Green's money be placed in the sack with the African's money. "They" put the money in a bag, rolled the bag up, and said they wanted to put it some place. Green said, "There's a glove compartment," and the African put the bag in the glove compartment.

The African said he was hungry for African food. Defendant said he knew a woman on Florida Street who could cook him some African food. Green said he would take them there, so, according to Green, "We headed to Florida and I turned right on Florida and went toward 10th. Before we got to 10th, they asked me to stop."

The African told Green that he would like to put the money in a more secure place. The African said, "If you would have an accident on the way back, somebody might get that." Green said he had a tool box "back there" with a lock on it. The African said "Okay." Green and the African got out. Green "went around" and unlocked the tool box. The African put the sack in the box and closed it up. Green locked the box and the men "drove on."

Green drove up the street and "they" said, "This is it right here." Defendant said that he would take the African "up here to this woman's house and get him something to eat." Defendant said, "You'd better go back and take your money back so you can get it in the bank right away, that money you took out." Green said "Okay" and left.

As Green got half way to the bank, he "figured" he had better get that money out and put his money back in the bank. He stopped his truck and got the sack out. "It had a roll of newspapers in it, no money. I took off and headed back to where I left them. I didn't see them anywhere. There were two men working on a house. I asked them if they had seen these two blacks and they said 'Yes.' Based on what they said to me, I drove down Rangeline and looked for a white car with a Texas license. I couldn't find it and I saw a police car and I told him my story."

On cross-examination, Green testified that the trip to the bank took place after defendant got his, defendant's, money and that defendant went to the bank because it was necessary that defendant witness a transaction between Green and the African. Green also said that at the bank defendant counted "the money" and put it in the sack while the African was holding the sack. The three men were together two or three hours.

Christina Burns testified that she was a college student who worked at McDonald's and that defendant, on the morning of the crime, was "hanging around" McDonald's

for three or four hours. The last time she saw defendant was right before noon. She said she kept an eye on defendant "because it's not every day you see somebody walking by a drive through for three or four hours at a time."

Dave Schlesselman testified that on the day of the crime he was hanging gutters near 11th and Florida. While eating lunch, Schlesselman saw a green Chevrolet pickup do a U-turn at 11th and Florida. There were three people in the truck, one "old white man" and two black men. The driver was Ralph Green. Both black men got out of the truck and started walking. The truck then drove north on Florida. After Green drove away, the two black men "turned around" and headed back east on 11th. After they had walked about 30 feet, a car with a Texas license plate pulled up and picked them up. Ten minutes later, Green came back and asked him if he had seen Green let out "two black guys" and he said he had. Later in the day, police officers showed him several photographs and he identified defendant as one of the two black men.

■ The defense was alibi. Defendant did not testify, but his wife testified that defendant was at their home in San Antonio, Texas, on the day of the offense.

Instruction 5 reads:

## "INSTRUCTION NO. 5

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with him with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aides or encourages the other person in committing it.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about June 13, 1989, in the County of Jasper, State of Missouri, the defendant or another man

took cash, property in the possession of Ralph Green, and

Second, that defendant or the other man did so without the consent of Ralph Green, and

Third, that defendant or the other man did so for the purpose of withholding it from the owner permanently, and

Fourth, that the property so taken had a value of at least one hundred fifty dollars,

then you are instructed that the offense of felony stealing has occurred, and if [you] [2] further find and believe from the evidence beyond a reasonable doubt:

Fifth, that with the purpose of promoting or furthering the commission of that felony stealing, the defendant acted together with or aided the other man in committing that offense,

then you will find the defendant guilty of felony stealing.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

If you do find the defendant guilty of felony stealing, you will return a verdict finding him guilty of felony stealing."

Defendant states: "The instruction hypothesized that either defendant or another man deprived the victim of his property without his consent; there is no evidence indicating that defendant committed this element of felony stealing so the jury was allowed to speculate as to conduct defendant might have done which was not supported by the evidence; while the evidence may have shown that defendant worked with the African, there was no evidence that defendant personally appropriated Green's money; the African put the money in the sack, put the sack in the glove compartment, and announced that the glove compartment was not a secure place for the money; when they stopped, the African placed the sack in the toolbox to be locked; since there was no evidence that defendant

---

**2.** Defendant makes no complaint concerning the fact that the instruction omitted the bracketed word.

appropriated Green's money and the evidence was that the African personally appropriated the money, the trial court erred in attributing the element required by paragraphs First, Second and Third of Instruction 5 to defendant."

■ An information may charge a defendant either as a principal or as an aider and encourager with the same legal effect. *State v. Brigman,* 784 S.W.2d 217, 222[11] (Mo.App.1989); *State v. Luckett,* 770 S.W.2d 399, 405[15] (Mo.App.1989); *State v. Newbold,* 731 S.W.2d 373, 385 (Mo.App. 1987). Although the information charged defendant as a principal, it was proper to submit to the jury a theory of accomplice liability. *Conley v. State,* 765 S.W.2d 332, 333[3] (Mo.App.1989); *State v. Crumbaker,* 753 S.W.2d 76, 78[4] (Mo.App.1988).

Defendant makes no contention that "the other man" referred to in Instruction 5 was any person other than the African. Under the evidence, the jury could not have thought otherwise. Defendant seems to argue that the actual taking of the cash was done by the African and not by defendant, and that the instruction is erroneous because it was couched in the alternative and there was no evidence that defendant himself took the cash. There is no merit in this argument.

From the time the three men met at McDonald's, where defendant had spent several hours awaiting the African and the victim, until the African and defendant rode off together, after Green had been fleeced, the acts of defendant and the African were ingeniously orchestrated. The offense of stealing was clearly committed by both of them acting at every step with common purpose. The record may be unclear as to whether defendant or the African made the switch so that the contents of the sack placed in the toolbox proved to be a roll of newspapers and not Green's $2,500 and, possibly, other money. There is no doubt, however, that the switch was made and that defendant and the African were jointly involved in its making. It is of no moment which one performed the sleight of hand maneuver. That was only one ingredient of a master plan.

MAI–CR.3d 324.02.1 is the instruction for "Stealing: Without Consent," and MAI–CR.3d 304.04 is the instruction for "Parties: Defendant's Responsibility for Conduct of Another Person." Instruction 5 was a blend of those two instructions. Note 7 of the Notes on Use under MAI–CR.3d 304.04 addresses four situations where a defendant acts with another person in committing an offense. One of those situations is where the offense is committed entirely by the other person and the sole basis for defendant's liability is that he aided the actor. Such were the situations in *State v. Scott,* 689 S.W.2d 758 (Mo.App.1985), and *State v. Sparks,* 701 S.W.2d 731 (Mo.App.1985), on which defendant relies. As the excellent brief of the state points out, they are factually distinguishable. The case at bar involved a well executed scheme in which defendant and the African were full participants throughout the commission of the larceny.

Another situation contemplated by Note 7 is where the evidence shows the defendant acted with another person and they jointly committed the offense. A third situation is where the evidence is not clear or conflicts as to whether defendant simply aided (and did not by his own conduct commit any elements of the offense), or acted jointly with another person (and by his conduct committed some or all of the elements of the offense). Whether the instruction should ascribe the element of the offense to the defendant *and* the other person or to the defendant *or* the other person is a decision to be made in light of the evidence. Instruction 5 may have used the language "defendant or the other man" because the drafter felt the evidence was unclear as to which man took the cash. That is understandable.

It should be noted that defendant challenges only paragraphs First, Second and Third of Instruction 5. The format of Instruction 5, and of MAI–CR.3d 304.04, is that paragraphs First through Fourth require findings only that the offense has been committed, the corpus delicti. It is paragraph Fifth, which defendant does not attack, that requires a finding of defen-

dant's involvement in the offense. It should also be noted that considerable flexibility is permitted, even with regard to paragraph Fifth.

Note 7 under MAI–CR.3d 304.04 contains the following:

> NOTE: Any variation in ascribing the elements of an offense to the defendant or to the other person or persons or any variation in the selection of alternatives in the paragraph following "then you are instructed that [*name of offense*] has occurred ..." shall not be deemed reversible error in the absence of prejudice.

A similar note was contained under the predecessor to MAI–CR.3d 304.04. See *State v. Dulany*, 781 S.W.2d 52, 56 (Mo. banc 1989); *State v. Cannon*, 744 S.W.2d 820, 825–826 (Mo.App.1987); and *State v. Van Black*, 726 S.W.2d 429, 430–432 (Mo. App.1987). In each of those cases instruction error was claimed and no prejudicial error was found, although the argument was made that defendant acted only as an aider and that another person committed the elements of the offense.

In *Dulany*, 781 S.W.2d at page 55 the court said: "[I]f the evidence is unclear as to which person committed the acts the disjunctive use is proper since the jury could find that either person committed the act." The court also said, at page 56: "Even if there had not been enough evidence for the jury to find defendant committed the acts, the disjunctive submission would not have been reversible error.... Defendant's admitted affirmative actions advanced the criminal enterprise and rendered her just as guilty as if she alone committed the acts."

The defense here was alibi. There was no claim that defendant was present but a nonparticipant in the scam.

Defendant's point has no merit. The judgment is affirmed.

### Case No. 17240

■ Movant appeals from the denial of his Rule 29.15 motion seeking post-conviction relief. Prior to the evidentiary hearing, movant filed an amended motion which was unverified. The trial court permitted movant to introduce evidence in support of the original motion. The unverified amended motion sought to set forth, in somewhat different language, the grounds contained in the original motion, including the ground which movant advances here. Movant's brief says, accurately, "In effect, however, the trial court permitted [movant] to go forward on the claim set forth in the amended motion." Even if the amended motion had been verified, that would not have affected the result. The lack of verification, under the circumstances here, does not require remand. See *Pollard v. State*, 807 S.W.2d 498, 502[7] (Mo. banc 1991).

■ Movant asserts that he was entitled to relief on his motion, and the trial court erred in ruling otherwise, because he was denied effective assistance of counsel at the jury trial in that counsel "failed to accurately advise movant of his liability as either a principal or as an accomplice for which he could receive the same punishment. Movant was prejudiced because he would not have requested a jury trial but for this incorrect advice of counsel." A sufficient answer to movant's point is that it is factually unsound.

Appellate review of the trial court's action on a Rule 29.15 motion is limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous. Rule 29.15(j).

At the motion hearing, movant testified that he had not been advised by counsel that he could be held as an accomplice to the crime of stealing from Ralph Green or that he could be held liable for the acts of another person. The attorney who represented movant at the jury trial testified that he had six or seven conversations with movant prior to the trial. In those conversations they discussed the state's evidence and the fact that the state was claiming "it was two individuals working together." The attorney said that movant was fully aware of the facts that the state was going to present and that he had explained to movant that a person can be held respon-

sible as a principal or as an aider or abettor.

In its findings, the trial court stated that defense counsel explained to movant that a person could, under the evidence, be responsible as a principal or as an aider or as an abettor. The trial court concluded: "Movant's claim that counsel was ineffective for not advising him that he would have to defend against accomplice liability is without merit."

The foregoing findings and conclusion of the trial court are not clearly erroneous and, indeed, are fully supported by the record. See *Geiger v. State,* 700 S.W.2d 168, 169 (Mo.App.1985), where the court held that disbelief of movant's testimony with regard to alleged erroneous advice from counsel was within the province of the trial court and was a basis for affirmance of the trial court's judgment denying post-conviction relief. Movant's appeal has no merit.

The judgment is affirmed.

MAUS and MONTGOMERY, JJ., concur.